IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN TOMLIN, | ) CASE NO. 4:23-CV-01192-CEH |
| | ) |
| Plaintiff, | ) |
| | ) JUDGE CARMEN E. HENDERSON |
| v. | ) UNITED STATES MAGISTRATE JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) **MEMORANDUM OPINION AND** |
| Defendant, | ) **ORDER** |
| | ) |

**I. Introduction**

Plaintiff, John Tomlin ("Tomlin" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF No. 10). For the reasons set forth below, the Court AFFIRMS the Commissioner of Social Security's nondisability finding and DISMISSES Plaintiff's Complaint.

**II. Procedural History**

On January 13, 2020, Claimant filed applications for DIB and SSI, alleging a disability onset date the same day. (ECF No. 8, PageID #: 44). The applications were denied initially and upon reconsideration, and Tomlin requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On July 13, 2022, an ALJ held a hearing, during which Tomlin, represented by counsel, and an impartial vocational expert testified. (*Id.*). On September 8, 2022, the ALJ issued a written decision finding Claimant was not disabled. (*Id.* at PageID #: 44-57). The ALJ's decision became final on May 3, 2023, when the Appeals Council declined further review. (*Id.* at PageID #: 33).

1

On June 14, 2023, Claimant filed his Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 11, 14, 16). Claimant asserts the following assignments of error:

> (1) The ALJ adopted the examining opinion of Jennifer Haaga, Psy.D., and failed to incorporate Dr. Haaga's social limitations as part of the RFC or provide a legitimate basis for rejecting those limitations.
>
> (2) The ALJ failed to properly develop the record and obtain updated opinion evidence concerning Plaintiff's medically determinable impairment of hypothyroidism.
>
> (3) The ALJ failed to properly consider SSR 16-3p when evaluating Plaintiff's pain symptoms resulting from his lumbar degenerative disc disease, and failed to provide valid reasons for disregarding Plaintiff's testimony.

(ECF No. 11 at 1).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

> The claimant was 50 years old on his alleged disability onset date in January 2020, with a history of physically demanding work in chemical manufacturing, where he operated a bobcat, front-end loader, shaker table, and welding torch. He testified that he left this job due to neck pain that radiates to his arms, back pain that radiates to his legs, bilateral knee pain requiring bilateral surgeries, weakness in his hands, and pain in his feet; he said that he has not worked since that time because in addition to his physical pain and limitations, he has a "hard time learning new things" and problems with his memory, such that he would be unable to learn, or would forget and have to be re-taught, the duties of any new job.
>
> The claimant stated, consistent with the limitations asserted in his Function Report, that he can probably lift 20 pounds, but that his hands are weak and painful, causing him to drop things, and that his hands "cramp up" with tasks of fine dexterity, such as manipulating buttons and shoelaces. He said that his leg pain and lower extremity limitations are primarily due to his bilateral knee pain and his need for bilateral knee replacements, which result in knee swelling that requires icing and elevation three times daily for 45 minutes, and knee pain that limits him to walking no further than "from the living room to the kitchen". He also reports pain and swelling in his feet due to spurs and neuropathy, and he uses

2

a walker once or twice a week. His neck/shoulder/arm pain limits his abilities reach in all directions.

In describing a typical day, the claimant reported that he lives with his wife and two grandchildren, that his wife works full-time, that his wife and granddaughter do the household cleaning and shopping, that he maintains a valid driver's license, that he visits with a friend, and that he goes to his grandson's baseball games and other activities of his grandchildren "if [he] can." In noting activities in which he can no longer engage, the claimant listed mowing the yard and coon hunting.

(ECF No. 8, PageID #: 51).

**B. Relevant Medical Evidence**

The ALJ also summarized Claimant's health records and symptoms:

The medical evidence of record establishes that, when seen by Prabhudas Lakhani, M.D., in consultative physical examination in 2018, the claimant complained of radiating neck and back pain, and of hand pain and peripheral vascular disease, but x-rays of his lumbar spine showed only mild degenerative changes, x-rays of his right hand were normal, and his feet remained well perfused and without trophic changes. Uon [sic] examination, the claimant demonstrated normal strength, sensation, and reflexes (Exhibit 1F). Although the claimant was unable to walk on heels or toes, his straight leg raise test was positive bilaterally, the range of motion in his cervical spine was "somewhat restricted," and the range of motion in his lumbar spine was "considerably limited," and although Dr. Lakhani opined that the claimant "should be able to sit for at least 3 to 4 hours" during an 8-hour workday, the claimant returned to his medium/heavy work in 2019, earning SGA-level wages, as noted above; as a result, Dr. Lakhani's assessment is neither probative nor persuasive in determining the claimant's physical capacity for work since January 2020.

In September 2019, the claimant presented to his local emergency department with a complaint of "neck swelling" and a report that he had "not had his thyroid assessed in a significant amount of time" (Exhibit 4F). According to the record, the claimant's primary care provider, Joseph Potocki, D.O., had prescribed the claimant Synthroid in July (Exhibit 5F/7). Examination of the claimant revealed mild tachycardia and anterior cervical chain lymphadenopathy bilaterally. Lab studies confirmed "markedly elevated TSH" consistent with hypothyroidism, and the claimant was discharged with instructions to follow up with his primary care physician (Exhibit 4F).

The claimant returned to Dr. Potocki, who did not document the claimant's ER visit or thyroid issue, but who did note the claimant's reported flu-like symptoms, and also refilled the claimant's Tylenol #3 (Exhibit 5F).

3

In October 2019, the claimant again sought emergency department treatment of "severe" neck pain "for the past 2 days," but imaging studies showed only a small central disc bulge at C4-5, and minimal narrowing of the right neuroforamen at C6-7, and the claimant's exam was remarkable only for "mild tenderness to the cervical spine and moderate tenderness to the left paraspinal soft tissue" (Exhibit 3F/8).

Dr. Potocki wrote in November 2019 that the claimant had "no signs of diabetes at present"; he increased the claimant's thyroid medication and started the claimant on blood pressure medication, with advice regarding lifestyle and diet modifications (Exhibit 5F/5).

On December 12, 2019, Dr. Potocki diagnosed the claimant with a lumbosacral strain; on December 20th, he documented positive straight leg raise findings, and on January 12, 2020, the claimant's exam for complaints of chest pain was remarkable for a dorsal muscle spasm (Exhibit 5F/3).

The claimant was continued on Tylenol #3, Synthroid, and blood pressure medications into March 2020, when the claimant had a documented Body Mass Index (BMI) of 28 and another ER visit for chest pain, unremarkable for coronary findings but positive for an elevated thyroid level. Dr. Potocki increased the claimant's thyroid medication, and noted "no work" until "recheck" in a few days (Exhibit 3F/3). In April 2020, Dr. Potocki continued the claimant on Tylenol #3 and blood pressure and thyroid medications, "with a couple refills". In May 2020, the claimant complained of lightheadedness but his exam was remarkable for a rash consistent with poison sumac (Exhibits 4F/3, 5F/2). The claimant last saw Dr. Potocki in June 2020, and according to this treatment note, the claimant was continued on Synthroid, and on Tylenol #3 for a left lumbar muscle spasm and left leg pain (Exhibit 5F/1).

According to the notes from the claimant's August 2020 gastroenterology consult, however, the claimant's documented medications also included a Ventolin inhaler, statin and allergy medication, blood pressure medication, GERD and constipation medication, and diazepam (Exhibit 9F/9). The claimant was seen for complaints of abdominal pain and chronic constipation; he had a BMI of about 33, and his exam was otherwise unremarkable, and apart from an increased BMI just over 34, the claimant's exam was unchanged in October 2021 (Exhibit 9F). In the interim, a July 2021 scoping procedure was essentially unremarkable, and his symptoms were deemed "narcotic bowel syndrome/opioid induced constipation from being on Norco,"

Ultrasound studies of the vasculature in the claimant's lower extremities, performed in September 2020, showed no evidence of significant arterial stenosis, while accompanying coronary studies confirmed an unremarkable ejection fraction of 60 percent (Exhibits 7F/13, 8F/320)

4

In December 2020, the claimant saw Richard Weitzel, Jr., M.D., in cardiology consultation (Exhibit 7F/10). The claimant acknowledged being a "heavy smoker" and a "retired titanium welder and cutter," but updated coronary studies obtained in January 2021 showed an improved ejection fraction of 73 percent, and no evidence of stress-induced ischemia. However, due to "some underlying COPD" and knee pain, the claimant only achieved 56 percent of maximum predicted heart rate before testing was terminated because of fatigue (Exhibit 7F/8, 14).

The claimant was seen by Michael Jurenovich, D.O., in orthopedic evaluation of his knee pain in February 2021, at which time he said that he'd had a "falling out" with his prior orthopedist, Thomas Jones, Jr., M.D. (Exhibit 6F/10). The claimant reported that a prior MRI of his right knee had shown only an MCL sprain, and although x-rays also showed only mild arthritis, the claimant said that his pain was much worse than in the past (Exhibit 6F/10). Pending the results of updated imagings, Dr. Jurenovich provided the claimant with a knee brace and a TENS unit (Exhibit 6F/10).

According to the notes of Dr. Jones, the claimant had been "independent and pain free" prior to his initial presentation in October 2020, and based upon MRI results showing a Grade 1-2 MCL sprain of his right knee, Dr. Jones had recommended, in November 2020, a regimen of physical therapy, meloxicam, and Mobic (Exhibit 11F). At his initial physical therapy evaluation in December 2020, the claimant complained of difficulty reaching his second floor bedroom due to "impaired stair mobility," in addition to being "unable to hunt, [and having] impaired ability to take care of yardwork, [and] … impaired ability to complete maintenance tasks around home" (Exhibit 11F). The claimant did not return, either no-showing or canceling his appointments due to "has to watch [the] grandkids," and he was therefore discharged (Exhibit 11F/35)

The claimant's updated right knee MRI did confirm that the sprain was now a complex tear of the medial meniscus, extending to both articular surfaces, with a displaced flap fragment and a subchondral cyst in the medial patella (Exhibit 6F/16). Arthroscopic repair was recommended and performed, and on April 12, 2021, noting that the claimant had done well post-operatively, Dr. Jurenovich released the claimant from his care (Exhibit 6F/7).

The claimant returned with left knee complaints in August 2021, reporting that he injured this knee "a few months ago". Although the claimant's left knee displayed swelling and large effusion, bilateral knee x-rays were essentially the same, showing only mild narrowing the medial joint compartment and tiny osteophytes, with mild genu varus (Exhibit 6F/14). However, the results of the claimant's October 2021 MRI revealed a complete curvilinear radial tear of the medial meniscus, extending from the free margin to the periphery, with mild subchondral bone marrow edema (Exhibit 6F/12). Arthroscopic repair was performed in December 2021, and on January 3, 2022, the claimant was again released from Dr. Jurenovich's orthopedic care (Exhibit 6F/1).

5

>Updated x-rays of the claimant's lumbar spine revealed no significant abnormality (Exhibit 6F/30). The most recent imagings of the claimant's cervical spine were obtained in October 2019, and showed only a small disc bulge and minimal neuroforaminal narrowing. The claimant did not seek orthopedic or neurosurgical evaluations, and until his recent testimony, did not voice any significant or going complaints of neck/arm pain and/or hand weakness (Exhibits 3F, 4F). Coronary studies have been unremarkable (Exhibit 7F).

(ECF No. 8, PageID #: 52-54).

## IV.     The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since January 13, 2020, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: Obesity; hypertension; diabetes mellitus; cervical and lumbar degenerative disc disease; degenerative joint disease of the bilateral knees, status post bilateral meniscectomies; bilateral calcaneal spurs; palpitations; and, adjustment disorder with mixed anxiety and depressed mood (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with the following limitations: The claimant can never climb ladders, ropes, or scaffolds; he must avoid exposure to unprotected heights and hazardous machinery; and he can no more than occasionally climb ramps/stairs, balance, stoop, kneel, crouch, crawl, and reach overhead. The claimant is limited to simple routine tasks, involving simple work-related decisions, and he can tolerate few changes in a routine work setting.

6. The claimant is unable to perform past relevant work (20 CFR 404.1565 and 416.965).
. . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 13, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(ECF No. 8, PageID #: 46-47, 50, 55-56).

## V. Law & Analysis

### A. Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B. Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-

7

insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.*

### C. Discussion

Claimant raises three issues on appeal, arguing the ALJ failed to (1) "incorporate Dr. Haaga's social limitations as part of the RFC or provide a legitimate basis for rejecting those limitations;" (2) "properly develop the record and obtain updated opinion evidence concerning Plaintiff's medically determinable impairment of hypothyroidism;" and (3) "properly consider SSR 16-3p when evaluating Plaintiff's pain symptoms resulting from his lumbar degenerative disc disease." (ECF No. 11 at 1).

#### 1. The ALJ properly considered Dr. Haaga's opinion.

Claimant's first argument challenges the ALJ's treatment of Dr. Haaga's opinion, specifically as to his social limitations.

8

For claims filed after March 27, 2017, the regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* Medical source opinions are evaluated using the factors listed in § 404.1520c(c). The factors include supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice, if any; and "other factors that tend to support or contradict a medical opinion." *Id.* at § 404.1520c(c). The ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. *Id.* at § 404.1520c(b)(2). Under the regulations, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be" and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c).

The ALJ provided a detailed summary of Dr. Haaga's notes and conclusions based on a consultative psychological evaluation with Claimant:

> During his 2018 consultative psychological evaluation with Dr. Haaga, the claimant reported that, prior to quitting school, he had "a history of learning difficulties with math," he had been retained due achieving generally poor grades, and he had "a history of detentions, suspensions, and expulsions for fighting and 'crazy stuff'" (Exhibit 2F). The claimant, however, denied receiving special education, IEP, or behavioral services (Exhibit 2F). The claimant did not report suffering a traumatic brain injury and resulting coma when he was teen, nor did he report injuring himself in a fall from a tree; instead, he said that he "broke [his]

9

> back and never went to the hospital," that he had "some history of interpersonal problems with supervisors and coworkers," that he had histories of substance use and incarceration, that he had "a tree business until [he] got robbed," and that, before working uneventfully for nearly ten years as a heavy machine (bobcat and front-end loader) operator, "it was hard to keep a job because [he] was always in trouble and drinking and doing drugs" (Exhibit 2F).
>
> In describing a typical day in 2018, the claimant said that he lived with his ex-wife and stepson; that he had a grown daughter, a son who had died in work-related accident in 2012, and another son with substance use issues; that he didn't drive "much" because "it hurts"; that he also slept poorly, did no particular chores, and didn't "do much," because of his back and leg pain; and that he spent most days "watch[ing] a lot of TV" (Exhibit 2F).
>
> The claimant appeared "restless," "disheveled," "somewhat down," and "had dirt on his hands," he displayed "difficulties standing and walked with a limp," he "reported he was in pain and shifted in his chair," but he "maintained good eye contact, demonstrated adequate motivation," and "was cooperative" with the evaluation (Exhibit 2F). His speech was clear, his thought processes were logical, organized, coherent, and goal-directed, and he had no motor manifestations of anxiety despite reported worry, stress, and irritability related to family deaths and other family issues, and also "his situation [and] his health" (Exhibit 2F).
>
> Clinically, the claimant did not know his entire Social Security number, he needed reminders of what he was asked, he recalled three digits backward, and his delayed recall was 1/3. He had no knowledge of Dr. Martin Luther King, Jr., and he could not perform mental multiplication or division (Exhibit 2F). However, his attention and concentration, as well as his ability to abstract, were "adequate," he demonstrated "fair" common sense reasoning and judgment, and "fair" insight (Exhibit 2F).
>
> From these observations and clinical findings, Dr. Haaga diagnosed the claimant with an adjustment disorder with mixed anxiety and depression (and also borderline intellectual functioning, as discussed above), she noted that the claimant reported having no income and no medical insurance coverage, and while she concluded that the claimant "would likely have some difficulties with learning other types of jobs due to [his] estimated level of cognitive functioning," Dr. Haaga also concluded that there was "no indication that [the claimant] would be unable to manage" his own benefits, if awarded (Exhibit 2F, emphasis added).

(ECF No. 8, PageID #: 48-49).

The ALJ then discussed other portions of the record in comparison to Dr. Haaga's opinion and explained his treatment of the opinion:

10

Apart from the adjustment disorder diagnosed by Dr. Haaga in 2018, the claimant has not been diagnosed with, or, consequently, prescribed medication for, any affective condition; thus, the claimant has no history of specialized mental health treatment, and there is no evidence that such treatment has been advised, recommended, or even suggested as a beneficial way to manage his alleged chronic pain.

The claimant earned SGA-level wages in excess of $27,000 in 2019, and when filing his applications in January 2020, the claimant did not allege a cognitive or affective basis for disability (Exhibits 1D, 2D, 4D, 1E, 2E).

In his Function Report, completed in April 2020, the claimant denied needing reminders to complete tasks or take medications, and he not only denied having any difficulties with memory, concentration, comprehension, following instructions, or getting along with others, he specifically acknowledged – despite an asserted ability to pay attention only "for short periods of time" – his abilities to finish what he starts, to follow written instructions "well," to follow oral instructions "good," to get along "good" with authority, to handle stress "good," and to adjust to changes in routine without any particular problem (Exhibit 6E).

Medical providers have, without notable or longitudinal exception, found the claimant cognitively and affectively unremarkable, and the State agency psychological consultants concluded that the claimant has no limitations in his work-related cognitive, interactive, attentive, or adaptive functioning (Exhibits 1A, 2A, 5A, 6A, 3F, 4F, 8F, 9F).

Thus, there is no medical or opinion evidence suggesting that the claimant has marked, extreme, or work-preclusive limitations in his mental functioning, and while one could conclude, as did the State agency psychological consultants, that the claimant has had no limitations in his work-related mental functioning since January 2020, the undersigned adopts Dr. Haaga's most favorable assessment of record, and finds that the claimant has the following degrees of limitation in the areas of work-related mental functioning known as the "Paragraph B" criteria:

. . .

<u>Interacting with others: Mild limitations.</u> The claimant's capacities to engage appropriately with others and to handle ordinary interpersonal conflict in a work setting, are acknowledged and evidenced by his history of SGA-level work, as well as his appropriate interactions with medical providers, which also demonstrate his ability to ask for help when needed. Dr. Haaga advised that the claimant would "struggle" to understand/respond appropriately to non-verbal cues and correction/criticism in a work setting, but even Dr. Haaga's own interactions with the claimant do not suggest that this limitations in this area are more than mild.

(*Id.* at PageID #: 49-50).

Claimant argues the ALJ erred because he "failed to include any social limitation into the RFC, although Dr. Haaga opined that in relationship to supervisors and coworkers, Plaintiff 'would likely struggle to appropriately manage conflict and criticism in work situations.'" (ECF No. 11 at 11-12). Claimant argues that the ALJ did not properly consider the required supportability and consistency factors when he discounted Dr. Haaga's opinion and found that Claimant had only a mild limitation in social functioning. (*Id.* at 12-15).

The Commissioner responds that "[c]ontrary to Plaintiff's assertion, the ALJ discussed both the supportability and the consistency of Dr. Haaga's opined social limitations before concluding that Plaintiff had no more than mild limitations in his ability to interact with others." (ECF No. 14 at 11). The Commissioner argues that the evidence Claimant cites and Dr. Haaga discussed in her reports "is not objective medical evidence. Instead, it consists of Dr. Haaga's documentation of Plaintiff's subjective reports regarding his inability to interact with others." (*Id.* at 12). Additionally, the Commissioner argues that "Dr. Haaga's statements about Plaintiff's social functioning do not constitute a medical opinion under the regulations" because "Dr. Haaga did not provide an opinion as to specific functional limitations; rather, she merely stated that Plaintiff 'would likely struggle' to appropriately manage conflict and criticism in work situations, and his family relationships 'may create' a lack of social support system, which 'may negatively influence' his ability to withstand stress and pressures of work activities." (*Id.* at 14).

Claimant replies that because the ALJ "explicitly chose to follow Dr. Haaga's medical opinion," "the limitations provided by Dr. Haaga should be followed when assessing the RFC." (ECF No. 16 at 2). As to whether Dr. Haaga's opinion is a medical opinion, Claimant asserts that the "ALJ refers to Dr. Haaga's report as an 'assessment' and does not state it should not be

12

considered opinion evidence." (*Id.* at 3).

The Court agrees with the Commissioner that the ALJ adequately considered the supportability and consistency factors.[1] As to supportability, the ALJ noted that Dr. Haaga's "own interactions with the claimant" did not support more than mild limitations in interacting with others. (ECF No. 8, PageID #: 50). The ALJ noted that Dr. Haaga's notes indicated that Claimant "'maintained good eye contact, demonstrated adequate motivation,' and 'was cooperative' with the evaluation" and his interaction with Dr. Haaga was "adequate." (*Id.*; *see id.* at PageID #: 353). The ALJ also addressed consistency, pointing to the lack of other medical records reflecting any affective condition or mental health treatment; Claimant's previous ability to successfully work combined with his failure to allege "a cognitive or affective basis for disability" in his application; and, perhaps most significantly, Claimant's own Function Report indicating that he followed instructions "well" or good", handled stress "good," and got along with authority "good." (*Id.* at PageID #: 49; *see id.* at PageID #: 303-04). Based on this discussion, substantial evidence supports the ALJ's conclusion not to include social limitations in the RFC. Because substantial evidence supports the ALJ's conclusion, the Court must defer to it, "even if there is substantial evidence that would have supported an opposite conclusion." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).

## 2. The ALJ did not err in failing to further develop the record.

In his second argument, Claimant asserts that the ALJ failed to consider evidence of his hypothyroidism from after March 2020. (ECF No. 8 at 16). Based on this position, Claimant argues that the ALJ was required to obtain additional opinion evidence because (1) "the ALJ

---

[1] The Court need not address the Commissioner's argument that Dr. Haaga's statement is not a medical opinion under the regulations because, even assuming that it qualifies as an opinion, the ALJ properly considered the relevant factors in discounting the opined social limitations.

13

would be required to interpret raw medical data by evaluating and comparing the ultrasounds of the thyroid taken on September 21, 2020 and June 6, 2022, along with Plaintiff's laboratory testing" and (2) "there are two years of medical records concerning Plaintiff's impairment of hypothyroidism, from 2020 to 2022, which were never reviewed by a medical source." (*Id.* at 17-18).

The Commissioner responds that the "ALJ considered the evidence of record regarding hypothyroidism both prior to and after March 2020." (ECF No. 14 at 16). The Commissioner argues that the "ALJ reasonably found that Plaintiff's hypothyroidism had been stable and well-controlled on routine medication" and this finding is "supported by Plaintiff's failure to return to see his primary care provider, Dr. Potocki, after June 2020, and by his maintenance on routine thyroid replacement medication—with adjustments as needed—without symptom exacerbation requiring a referral to an endocrinologist." (*Id.* at 18). Additionally, "[a]lthough Plaintiff asserted that he needed to have his thyroid removed, there is no evidence in the file to substantiate this assertion, nor is there evidence to show that, even if this were substantiated, there would be additional functional limitations following removal of his thyroid." (*Id.* (citations omitted)).

Claimant replies that there is not substantial evidence to support that the ALJ ever considered the September 21, 2020 and June 6, 2022 ultrasounds. (ECF No. 16 at 4). Claimant asserts that "another court has found grounds for remand if an ALJ failed to consider a claimant's statements with regard to the effect of his thyroid condition." (*Id.* at 4).

In making his argument, Claimant relies on *Timothy R.J. v. Commissioner of Social Security*, No. 3:22-cv-216, 2023 WL 2258524 (S.D. Ohio Feb. 28, 2023), which in turn relies on this Court's decision in *Gonzales v. Commissioner of Social Security*, No. 3:21-cv-000093-CEH, 2022 WL 824145 (N.D. Ohio Mar. 18, 2022). (ECF No. 11 at 15). In *Gonzales*, this Court

explained:

> [I]n some circumstances, an ALJ is required to obtain a medical opinion in furtherance of her 20 CFR § 404.1545(a)(3) responsibility to develop the record. *See Harper v. Comm'r of Soc. Sec.*, No. 1:20-CV-1304, 2021 WL 2383833, at *14 (N.D. Ohio May 25, 2021), *report and recommendation adopted*, No. 1:20-CV-1304, 2021 WL 2381906 (N.D. Ohio June 10, 2021). Such a circumstance exists where the medical evidence requires the ALJ to make medical judgments of a claimant's functional abilities by interpreting raw medical data. *See Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *9 (N.D. Ohio Sept. 29, 2021) ("Courts are generally unqualified to interpret raw medical data and make medical judgments concerning the limitations that may reasonably be expected to accompany such data."); *see Mascaro v. Colvin*, No. 1:16CV0436, 2016 WL 7383796, at *11 (N.D. Ohio Dec. 1, 2016) (noting neither the ALJ nor the court had the medical expertise to conclude whether the results of a neurological exam necessarily ruled out the existence of a disabling condition). Also, a medical opinion is necessary "where a 'critical body' of the 'objective medical evidence' is not accounted for by a medical opinion and there is significant evidence of potentially disabling conditions." *McCauley v. Comm'r of Soc. Sec.*, No. 3:20-CV-13069, 2021 WL 5871527, at *14–15 (E.D. Mich. Nov. 17, 2021), *report and recommendation adopted*, No. 20-CV-13069, 2021 WL 5867347 (E.D. Mich. Dec. 10, 2021) (citing *Branscum v. Berryhill*, No. 6:17-CV-345, 2019 WL 475013, at *11 (E.D. Ky. Feb. 6, 2019)). At such times, "the ALJ should develop the record by obtaining opinion evidence that accounts for the entire relevant period." *Id.*

2022 WL 824145, at *8. In that case, the medical evidence that was not considered included multiple x-rays and records concerning Gonzales's left knee replacement and recovery. *Id.* at *9. The Court noted that while only seven months of medical evidence followed the State agency review, that "body of evidence clearly indicate[d] that despite having [a] left total knee replacement, [Gonzales] showed continuing objective signs of functional limitations in her lower extremities" such that there was a "'critical body' of the 'objective medical evidence' that [was] not accounted for by a medical opinion." *Id.* at *10. Accordingly, the Court concluded the ALJ erred by failing to further develop the record. *Id.* at *11.

Here, Claimant points to a September 21, 2020 ultrasound showing "diffusely heterogeneous thyroid gland," Dr. Weitzel's notes indicating Claimant complained of pain and

15

that Weitzel "felt possible mild thyroid enlargement," a June 6, 2022 ultrasound showing "the thyroid gland at the upper limits of normal in size," and elevated TSH levels. (ECF No. 11 at 16-17). However, this does not amount to a "critical body of evidence" such as this Court found in *Gonzales*. Further, while he did not specifically discuss all the records cited by Claimant, the ALJ did discuss instances of Claimant's elevated thyroid levels and enlarged thyroid but concluded they did not impose more than minimal limitations. (ECF No. 8, PageID #: 47, 52-53). The ALJ specifically noted that "[n]one of the claimant's medical providers have advised that the claimant is disabled." (*Id.* at PageID #: 55). Thus, the situation here is not one where the ALJ was required to interpret "raw medical data" or where a critical body of objective medical evidence was not accounted for in the face of "significant evidence of potentially disabling conditions." *See Gonzales*, 2022 WL 824145, at *8.

Accordingly, the ALJ did not err by failing to further develop the record.

### 3. The ALJ did not err in considering Claimant's subjective complaints.

In his final argument, Claimant argues that the "ALJ failed to sufficiently articulate why Plaintiff's symptoms resulting from his back impairment should be found as inconsistent with the record." (ECF No. 11 at 20). Claimant asserts that "the only rationale provided by the ALJ that can be linked to Plaintiff's back impairment is that updated x-rays of Plaintiff's lumbar spine revealed no significant abnormality and Plaintiff did not seek orthopedic or neurosurgical evaluations" but "[a]n ALJ is not permitted to disregard an individual's statements about the effects of symptoms 'solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual.'" (*Id.* at 20 (citing SSR 16-3p)). Claimant argues that the ALJ "fails to otherwise discuss why Plaintiff's lumbar back pain and radicular leg pain should not be made a part of the RFC." (*Id.*).

16

The Commissioner responds that the "ALJ not only considered objective medical findings, but also considered Plaintiff's reported symptoms, activities of daily living, and treatment history/efficacy." (ECF No. 14 at 20). The Commissioner points to the ALJ's discussion of x-rays of the lumbar spine showing no significant abnormalities, the fact that Claimant had not visited his pain medication prescriber since June 2020 and reported being "pain free" prior to October 2020; and Claimant's daily activities. (*Id.* at 20-21). The Commissioner argues that Claimant has not shown that the ALJ's finding "is not supported by substantial evidence." (*Id.* at 22).

Claimant replies that an October 2020 treatment note indicating he was "independent and pain free prior to early October 2020" relates only to his right knee pain without any indication that "Dr. Jones, Jr. was performing an overall physical assessment of Plaintiff" such that it "should not serve as substantial evidence to reject all of Plaintiff's statements regarding his lumbar degenerative disc disease and radicular leg pain." (ECF No. 16 at 6). As to his daily activities, Claimant argues the ALJ "did not sufficiently explain how these activities discounted [his] testimony." (*Id.* at 6-7).

The evaluation of a claimant's subjective complaints rests with the ALJ. *See Siterlet v. Sec'y of HHS*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers*, 486 F.3d at 248 (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. § 404.1529(c); SSR 16-3p, 2017 WL 5180304.

Beyond medical evidence, SSR 16-3p sets forth seven factors that the ALJ should consider: daily activities; location, duration, frequency, and intensity of the pain or other

17

symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of medication to alleviate pain or other symptoms; treatment other than medication; any measures other than treatment the individual uses to relieve symptoms; and any other factors concerning the individual's functional limitations and restrictions. 2017 WL 5180304 at *7-8. The ALJ need not analyze all seven factors but should show that she considered the relevant evidence. *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005). SSR 16-3p states:

> [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner.

The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so."). While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248–49), *report and recommendation adopted*, 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

Here, the ALJ "concluded that while the claimant's medically determinable impairments could reasonably be expected to produce the types of symptoms alleged, the asserted intensity,

persistence, and limiting effects of those symptoms lack objective and overall record support." (ECF No. 8, PageID #: 51). In discussing the medical history, the ALJ noted that despite Claimant's complaints of neck and back pain in 2018 (before the alleged onset date), Claimant was able to return "to his medium/heavy work in 2019." (*Id.* at PageID #: 52). The ALJ indicated that "[u]pdated x-rays of the claimant's lumbar spine revealed no significant abnormality;" imaging from October 2019 "showed only a small disc bulge and minimal neuroforaminal narrowing;" and Claimant "did not seek orthopedic or neurosurgical evaluations." (*Id.* at PageID #: 54; *see id.* at PageID #: 362-63, 395,657). This discussion makes clear that the ALJ found that Claimant's claims of disabling back pain were not "consistent with the medical signs and laboratory findings of record," which is a proper consideration in evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *5.

The ALJ also noted that Claimant "acknowledged he was independent and pain free prior to [October 2020], and he did not complain of being unable to hunt until his physical therapy evaluation in late 2020." (ECF No. 8, PageID #: 54). While Claimant argues that the notation to Claimant being "pain free" was only in relation to his knee pain rather than his back, the cited record indicates that Claimant "was independent and pain free" before the knee pain began, despite having a documented medical history of "back pain." (*Id.* at PageID #: 1103-04). Thus, it was not unreasonable for the ALJ to conclude that this statement applied to Claimant's back pain as well.

Additionally, the ALJ noted that despite Claimant's complaints of pain, "[n]one of [his] medical providers have advised that the claimant is disabled." (*Id.* at PageID #: 55). Further, the ALJ relied on the opinions of the State agency consultants in rendering the RFC. "An RFC determination that is supported by the medical opinions of state agency physicians is generally

19

supported by substantial evidence." *Sittinger v. Comm'r of Soc. Sec.*, No. 1:22-CV-01927-BYP, 2023 WL 6219412, at *13 (N.D. Ohio Sept. 7, 2023), *report & recommendation adopted sub nom.*, 2023 WL 6214530 (N.D. Ohio Sept. 25, 2023); *see also Maldonado o/b/o A.C. v. Kijakazi*, No. 4:20-CV-1878, 2022 WL 361038, at *6 (N.D. Ohio Jan. 14, 2022) ("There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision.") (collecting cases), *report & recommendation adopted sub nom.*, 2022 WL 356557 (N.D. Ohio Feb. 7, 2022).

Overall, the ALJ's decision makes clear that he discredited Claimant's statements based on the medical evidence in the record, the medical opinions, and Claimant's statements to providers during the relevant time frame. It is clear to the Court that the ALJ considered the relevant evidence in making his determination and that substantial evidence supports the ALJ's conclusion. As the Court will not reweigh the evidence when reviewing an ALJ's decision, no compelling reason exists for the Court to disturb the ALJ's credibility finding. *Cross*, 373 F. Supp. 2d at 732.

## VI. Conclusion

Based on the foregoing, the Court AFFIRMS the Commissioner of the Social Security Administration's final decision denying Plaintiff benefits. Plaintiff's Complaint is DISMISSED.

Dated: April 12, 2024

                                                   s/ *Carmen E. Henderson*
                                                   CARMEN E. HENDERSON
                                                   U.S. MAGISTRATE JUDGE